## UNITED STATES COURT OF INTERNATIONAL TRADE

-------------------------------------------------------------------- X

| | |
|---|---|
| TABACOS DE WILSON, INC, | : |
| TOBACCO RAG PROCESSORS, INC., | : |
| BROWN-USA, INC., | : |
| NIPPON AMERICA GROUP/OKURA USA INC., | : |
| SKATE ONE CORPORATION, | : |
| ALLIANCE INTERNATIONAL, CHB, INC., | : |
| C.J. HOLT & COMPANY, INC., | : |
| CUSTOMS ADVISORY SERVICES, INC. | : |
| | : |
| **Plaintiffs,** | : |
| | :   **No. 18-cv-59 (JAR)** |
| *v.* | : |
| | : |
| UNITED STATES OF AMERICA, | : |
| U.S. CUSTOMS & BORDER PROTECTION, | : |
| STEVEN T. MNUCHIN, in his official capacity as | : |
|   Secretary of the Treasury, *and* | : |
| KEVIN K. McALEENAN, in his official capacity as | : |
|   Commissioner, U.S. Customs & Border Protection, | : |
| | : |
| **Defendants.** | : |

-------------------------------------------------------------------- X

### PLAINTIFFS' RESPONSE IN OPPOSITION TO DEFENDANTS' MOTION TO DISMISS, AND REPLY IN SUPPORT OF PLAINTIFFS' MOTION FOR A PRELIMINARY INJUNCTION

John M. Peterson
Richard F. O'Neill
Russell A. Semmel
NEVILLE PETERSON LLP
One Exchange Plaza
55 Broadway, Suite 2602
New York, NY 10006
(212) 635-2730
jpeterson@npwny.com

April 23, 2018

# TABLE OF CONTENTS

PAGE

TABLE OF AUTHORITIES ......................................................................................... ii

INTRODUCTION ....................................................................................................... 2

STANDARD OF REVIEW ......................................................................................... 4

ARGUMENT ............................................................................................................. 5

I.    DEFENDANTS' MOTION TO DISMISS LACKS MERIT AND MUST BE DENIED ............................................................................................................. 5

    A.    This Action is Ripe for Judicial Review. ........................................................ 5

        1.    Counts I and II. .................................................................................. 11

        2.    Counts III and IV. .............................................................................. 17

    B.    Plaintiffs have Standing as to Counts III and IV. ................................... 19

    C.    All Counts State Claims Upon Which Relief Can Be Granted by this Court. ........ 23

        1.    Counts I and II. .................................................................................. 24

        2.    Counts III and IV. .............................................................................. 25

        3.    Count V. ............................................................................................. 28

II.    INJUNCTIVE RELIEF IS WARRANTED ....................................................... 31

    A.    Likelihood of Success on the Merits ........................................................ 31

    B.    Plaintiffs Will Be Irreparably Harmed Absent Issuance of an Injunction ............. 32

    C.    Balance of Hardships Favors Plaintiffs and the Public Interest Favors Granting the Injunction ...................................................................................... 36

III.    DEFENDANTS SHOULD BE ORDERED TO PRODUCE A COPY OF THE 450-PAGE DRAFT NPRM ON THE RECORD IN THIS ACTION. ...................................... 42

CONCLUSION ......................................................................................................... 45

WORD COUNT CERTIFICATION .......................................................................... 1

# TABLE OF AUTHORITIES

PAGE(S)

**Cases**

*Abbott Labs. v. Gardner*, 387 U.S. 136, 148 (1967)...........................................................6, 11, 15

*Adland v. Ross*, 307 F.3d 471 (6th Cir. 2000)...............................................................................20

*Am. Mining Cong. v. MSHA*, 995 F.2d 1106 (D.C. Cir. 1993).....................................................26

*Appalachian Power Corp. v. EPA*, 208 F.3d 1015 (D.C. Cir. 2000).............................................28

*Ashcroft v. Iqbal*, 129 S. Ct. 1937 (2009) .....................................................................................4

*Ass'n of Data Processing Serv. Orgs., Inc. v. Camp*, 397 U.S. 150 (1970) ................................20

*Ass'n of Flight Attendants v. Huerta*, 785 F.3d 710 (D.C. Cir. 2015).........................................17

*Banner v. Sibelius*, 797 F. Supp. 2d 97 (D.D.C. 2011)................................................................21

*Bell Atl. Corp. v. Twombly*, 550 U.S. 544 (2007) ..........................................................................4

*Bell v. Hood*, 327 U.S. 678 (1946)..................................................................................................5

*Cargill Citro Am. v. United States*, 29 Ct. Int'l Trade 941 (2005) ................................................9

*Cheney v. U.S. Dist. Ct.*, 542 U.S. 367 (2004)..............................................................................30

*Christensen v. Harris Cnty.*, 529 U.S. 576 (2000)........................................................................16

*Chrysler Corp. v. Brown*, 441 U.S. 281 (1979) ......................................................................13, 22

*Clapper v. Amnesty Int'l USA*, 133 S. Ct. 1138 (2013) ...............................................................21

*Cmty. Nutrition Inst. v. Young*, 818 F.2d 943, 948 (D.C. Cir. 1987)...........................................17

*Comité de Apoyo a los Trabajadores Agricolas v. Perez*, 774 F.3d 173 (3d Cir. 2014)...............6

*Consumers Union v. Miller*, 84 F.R.D. 240 (D.D.C 1979)......................................................16, 17

*Cooper v. Pate*, 378 U.S. 546 (1964)..............................................................................................4

*Dismas Charities Inc. v. DOJ*, 401 F.3d 666 (6th Cir. 2005) ......................................................22

*Eagle-Picher Indus., Inc. v. EPA*, 759 F.2d 905 (D.C. Cir. 1985)..................................................6

*Gen. Eng'g & Mach. Works v. O'Keefe*, 991 F.2d 775 (Fed Cir. 1991)........................................13

*Gen. Motors Corp. v. Ruckelshaus*, 742 F.2d 1561 (D.C. Cir. 1984)...........................................26

*Gladstone, Realtors v. Village of Bellwood*, 441 U.S. 91 (1979) ..................................................5

*Glycine & More, Inc. v. United States*, 880 F.3d 1335 (Fed. Cir. 2018) .........................11, 15, 16

*Gray v. SLC Coal Co.*, 176 F.3d 182 (6th Cir. 1999) .....................................................................9

*Henke v. United States*, 60 F.3d 795, 797 (Fed. Cir. 1995) ...........................................................4

*Iowa League of Cities v. EPA*, 711 F.3d 844 (8th Cir. 2013) ......................................................22

*Lujan v. Defenders of Wildlife*, 504 U.S. 555 (1992) ..........................................................4, 5, 21

PAGE(S)

*Minard Run Oil Co. v. USFS*, 670 F.3d 236 (3d Cir. 2011) .......................................... 18

*Ohio Valley Envtl. Coal. v. Army Corps of Eng'rs*, No. 08-979, 2008 U.S. Dist. LEXIS 88734 (S.D. Ohio Oct. 31, 2008) ................................................................................. 41

*Qingdao Taifa Grp. Co. v. United States*, 581 F.3d 1375 (Fed. Cir. 2009) ................... 31

*Rosenthal v. Bagley*, 450 F. Supp. 1120 (N.D. Ill. 1978) ....................................... 18, 26

*Sierra Club v. EPA*, 292 F.2d 895 (D.C. Cir. 2002) ...................................................... 21

*Simon v. E. Ky. Welfare Rights Org.*, 426 U.S. 26 (1976) ............................................... 5

*Susan B. Anthony List v. Dreihaus,* 134 S. Ct. 2334 (2014) ......................................... 21

*Syncor Int'l Corp. v. Shalala*, 127 F.3d 90 (D.C. Cir. 1997) ......................................... 27

*Telecommc'ns Research and Action Ctr. v. FCC*, 750 F.2d 70 (D.C. Cir.1984) ................... 28, 29

*Texas v. United States*, 523 U.S. 296, 300 (1998) ........................................................... 6

*The Pillsbury Co. v. United States*, 18 F. Supp. 2d 1034 (Ct. Int'l Trade 1994) ......................... 13

*Thomas v Union Carbide Agric. Prods.*, 473 U.S. 568 (1985) ....................................... 6

*Timken Co. v. United States*, 893 F.2d 337 (Fed. Cir. 1990) ......................................... 30

*United States v. Blum*, 858 F.2d 1566 (Fed. Cir. 1988) ................................................. 40

*United States v. James Daniel Good Real Property*, 510 U.S. 43 (1993) ..................... 28

*United States v. Nat'l Sugar Refining Co.*, 39 C.C.P.A. 96 (1951) ............................... 41

*Winter v. Natural Res. Def. Council, Inc.*, 555 U.S. 7 (2008) ....................................... 31

*Wolf Creek Collieries v. Robinson*, 872 F.2d 1264 (6th Cir. 1989) ................................. 9

**Statutes & Session Laws**

5 U.S.C. § 553 ................................................................................................ 15, 18, 26, 27

5 U.S.C. § 558 ...................................................................................................... 13, 24, 26

5 U.S.C. § 706 .................................................................................................. 6, 15, 28, 29

19 U.S.C. § 1313 ........................................................................................................ passim

28 U.S.C. § 2640 ................................................................................................................ 6

North American Free Trade Agreement Implementation Act, Pub. L. 103-182, 107 Stat. 2057 (1993) ................................................................................................................... 9

Trade Facilitation and Trade Enforcement Act of 2015, Pub. L. 114-125, 130 Stat. 122 (2016) ........................................................................................................................ 2, 8, 43

**Regulations & Federal Register Publications**

19 C.F.R. § 191.0 .................................................................................... 7, 12, 14, 24

19 C.F.R. § 191.92 ................................................................................................. passim

iii

PAGE(S)

*Drawback Statements from Manufacturers or Producers*, 40 Fed. Reg. 14,749 (U.S. Customs Serv. Apr. 2, 1975)............................................................................................... 37

**Legislative Materials**
H.R. Rep. 114-376 (2015) (Conf. Rep.) ................................................................... 3, 8

**Court Rules**
U.S. Ct. Int'l Trade R. 8 ............................................................................................ 4

U.S. Ct. Int'l Trade R. 12 ......................................................................................... 4, 5

**Miscellaneous**
Fraser, *Interpretive Rules: Can the Amount of Deference Afforded Them Offer Insight into the Procedural Inquiry?,* 90 Boston U. L. Rev. 1303 (2010)............................................. 27

## UNITED STATES COURT OF INTERNATIONAL TRADE

```
------------------------------------------------------------------- X
TABACOS DE WILSON, INC,                        :
TOBACCO RAG PROCESSORS, INC.,                  :
BROWN-USA, INC.,                               :
NIPPON AMERICA GROUP/OKURA USA INC.,           :
SKATE ONE CORPORATION,                         :
ALLIANCE INTERNATIONAL, CHB, INC.,             :
C.J. HOLT & COMPANY, INC.,                     :
CUSTOMS ADVISORY SERVICES, INC.                :
                                               :
        Plaintiffs,                            :
                                               :        No. 18-cv-59 (JAR)
                v.                             :
                                               :
UNITED STATES OF AMERICA,                      :
U.S. CUSTOMS & BORDER PROTECTION,              :
STEVEN T. MNUCHIN, in his official capacity as :
   Secretary of the Treasury, and              :
KEVIN K. McALEENAN, in his official capacity as :
   Commissioner, U.S. Customs & Border Protection, :
                                               :
        Defendants.                            :
------------------------------------------------------------------- X
```

## PLAINTIFFS' RESPONSE IN OPPOSITION TO DEFENDANTS' MOTION TO DISMISS AND REPLY IN SUPPORT OF PLAINTIFFS' MOTION FOR A PRELIMINARY INJUNCTION

Plaintiffs, Tabacos de Wilson, Inc., Tobacco Rag Processors, Inc., Brown-USA Inc., Nippon America, Inc., Skate One Corporation; Alliance International, CHB, Inc., C.J. Holt & Company, Inc., and Customs Advisory Services, Inc., by and through undersigned counsel, hereby respond in opposition to the Motion (*ECF No. 23*) of Defendants, the United States (the "Government"); U.S. Customs & Border Protection ("CBP" or "Customs"); Steven T. Mnuchin, in his official capacity as Secretary of the Treasury; and Kevin K. McAleenan, in his official capacity as Commissioner of CBP, to dismiss this action, and reply in further support of Plaintiffs' Motion (*ECF No. 13*) for a Preliminary Injunction.

## **INTRODUCTION**

Plaintiffs, a group of duty drawback claimants and customs-licensed drawback brokers, commenced this Administrative Procedure Act (APA) case to challenge the decision of CBP to terminate or suspend the operation of certain regulations through an informal "Guidance Document." Specifically, Plaintiffs challenge CBP's determination (1) to terminate or suspend the operation of the "accelerated payment of drawback" procedure set out in 19 C.F.R. § 191.92, and therefore to terminate or suspend the accelerated payment licenses held by the drawback claimant plaintiffs (Counts I and II); and (2) to impose legislative-type rules using the Guidance Document without following the notice-and-comment rulemaking procedures prescribed by the APA, *see* 5 U.S.C. § 553 (Counts III and IV). Plaintiffs have made application for a preliminary injunction with respect to the matters described in Counts I through IV, requiring CBP to restore operation of the accelerated payment of drawback regulation, and to prevent CBP from enforcing, *pendente lite*, those rules limiting drawback claimants' rights, as set out in the Guidance Document.

In addition, Plaintiffs assert that defendant the Secretary of the Treasury has unreasonably delayed administrative action required by law (Count V), by failing to enact a single regulation setting out the formula for calculating certain types of drawback by the February 24, 2018 deadline specified by Congress in Section 906(g) of the Trade Facilitation and Trade Enforcement Act of 2015, Pub. L. 114-125, 130 Stat. 122 (2016) ("TFTEA"). Plaintiffs do not seek a preliminary injunction in respect of this count, but instead seek judicial review, on the basis of the agency record, concerning whether Treasury has "unlawfully withheld or unreasonably delayed" required agency action, 5 U.S.C. § 706(1).

2

In response, the Government admits that Treasury did not issue the single required calculation regulation by the Congressionally-required February 24, 2018 deadline. *See* H.R. Rep. 114-376, at 219 (2015) (Conf. Rep.) ("This section [906(g)] *requires* the promulgation of the necessary regulations within 2 years") (emphasis added). Instead, CBP now appears to have attached that required calculation regulation to a much larger package of proposed discretionary rules—a 450-page draft Notice of Proposed Rulemaking (NPRM) setting out an entirely new "Part 190" to the CBP Regulations. *See* Defs.' Mem. Supp. Mot. Dismiss & Opp'n Mot. Prelim. Inj. 41, ECF No. 23-1 ("In fact, Customs is proposing an entirely new part of the C.F.R. (new part 190) to address the scope of the changes to drawback required by TFTEA").[1] Defendants contend that they cannot, or will not, grant payments of accelerated drawback to claimants—or process claims for drawback filed under TFTEA rules—until that massive regulatory package is proposed, subjected to public comment, and adopted as a final regulation—possibly several years from now.

Proposed "Part 190" of the CBP Regulations was accepted by the Office of Management and Budget (OMB) for review on April 6, 2018. Defs.' Mem. 3. As Defendants note, such review customarily takes ninety (90) days. *Assuming* that OMB timely approves the regulatory package, CBP might be expected to publish a NPRM in mid- to late-2018. However, as discussed herein, history indicates that, for major regulatory changes, the time between publication of an NPRM and issuance of a final regulation can take from *two to six years.* Such a major delay in enacting a single calculation regulation which Congress "required" to be made months ago, Plaintiffs suggest,

---

[1] TFTEA by its terms is self-executing, and the changes made in the law entered into force on February 24, 2018, without awaiting administrative action. The sole regulatory change mandated by TFTEA was the publication of a regulation respecting calculation of certain types of drawback. The remainder of "new part 190" would appear to be discretionary rulemaking not mandated by statute. Plaintiffs submit that it is unreasonably for CBP and Treasury to delay publication of the Congressionally-required regulation by appending it to a package of discretionary rules which are likely to take years to implement.

is unreasonable and unlawful.  It is particularly unreasonable when, as CBP suggests, failure to enact the rule requires CBP to shut down large portions of the drawback program now (and will result in a complete cessation of drawback claims processing after February 23, 2019).

Furthermore, Plaintiffs have stated a cause of action under the APA on which judicial relief may be granted by this Court, and this matter is ripe for judicial review.


## STANDARD OF REVIEW

In deciding a motion to dismiss for failure to state a claim, the Court must assume that all well-pleaded facts in the complaint are true, and must draw all reasonable inferences in the plaintiff's favor.  *Henke v. United States*, 60 F.3d 795, 797 (Fed. Cir. 1995); *see also Cooper v. Pate*, 378 U.S. 546 (1964).  U.S. Court of International Trade Rule 8(a)(2) requires that the pleading stating a claim for relief contain "a short and plain statement of the claim showing that the pleader is entitled to relief."  To survive a motion to dismiss, a complaint must plead sufficient factual matter, accepted as true, to state a claim that is "plausible on its face."  *Ashcroft v. Iqbal*, 129 S. Ct. 1937, 1949 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).

Motions seeking dismissal for want of Article III standing implicate a court's subject matter jurisdiction and are therefore reviewable under Rule 12(b)(1).  A federal court will not have subject matter jurisdiction to review a plaintiff's claims unless the plaintiff can demonstrate (i) that they have suffered some injury-in-fact; (ii) that there is a causal connection between the defendant's conduct and this injury-in-fact; and (iii) that this injury is redressable by the court.  *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560–61 (1992) (citations omitted).  The party who invokes the court's authority must "show that he personally has suffered some actual or threatened injury as a result of the putatively illegal conduct of the defendant," *Gladstone, Realtors v. Village of*

*Bellwood*, 441 U.S. 91, 99 (1979), and that the injury "fairly can be traced to the challenged action" and "is likely to be redressed by a favorable decision," *Simon v. E. Ky. Welfare Rights Org.*, 426 U.S. 26, 38, 41 (1976).

Where, as here, defendants have interposed motions to dismiss under both Rule 12(b)(1) (lack of jurisdiction) and 12(b)(6) (failure to state a claim), the Court must dispose of the 12(b)(1) motion before proceeding to the 12(b)(6) motion. *Bell v. Hood*, 327 U.S. 678 (1946).

## ARGUMENT

## I.    DEFENDANTS' MOTION TO DISMISS LACKS MERIT AND MUST BE DENIED.

Defendants have moved to dismiss the Complaint, alleging that the issues raised by Counts I through IV are not ripe for judicial review, and that, with respect to all five counts, Plaintiffs have failed to state a cause of action on which relief may be granted.  As discussed below, these claims are without merit.

### A.    This Action is Ripe for Judicial Review.

The Plaintiffs in this action are duty drawback claimants and drawback service providers who are adversely aggrieved by Defendants' actions.  Each of the Plaintiffs has demonstrated (i) that they have suffered an actual or imminent injury; (ii) that there is a causal connection between the Defendants' conduct and the injury-in-fact; and (iii) that the injury is redressable by a favorable decision of the Court. *Lujan*, 504 U.S. at 560-61.

As stated, the Plaintiffs hold licenses to receive drawback refunds on an accelerated basis pursuant to 19 C.F.R. § 191.92, and the Complaint alleges that the Plaintiffs' benefits derived therefrom have been suspended or rescinded by the Guidance Document.  CBP had indicated that, for claims made under TFTEA rules, it will neither accept nor process claims for accelerated

payment of drawback.  Compl. Ex. A, at 10.   As the APA empowers this Court to hold unlawful and "set aside" agency rulemaking (including the suspension or termination of rules) which are effected without observance of procedure required by law, 5 U.S.C. § 706(2)(D), the harm complained of can clearly be redressed by a favorable decision.  *See also* 28 U.S.C. § 2640(e) (in actions brought under 28 U.S.C. § 1581(i), "the [CIT] shall review the matter as provided in section 706 of title 5").

The Government asks this Court to determine whether this action, or any part thereof, is ripe for judicial review.  Courts are asked to analyze whether a plaintiff has suffered "injury in fact," or is facing a threatened "injury in fact" that has not yet occurred.  Thus, for Article III Constitutional standing to exist, an actual or threatened injury must be sufficiently likely, concrete, and imminent for the dispute to be considered an actionable "case or controversy."[2]

Here, the Government tries to obfuscate the finality of CBP's new approach to the drawback scheme set forth in the Guidance Document by describing its contents as "provisional rules" which "are not ripe for judicial review."  Defs.' Mem. 4.  The Government reasons that "[t]he provisional rules are nothing more than policy statements or interpretative rules. They do not constitute final agency action and are not reviewable."  *Ibid.*

---

[2] The U.S. Supreme Court has held that "[a] claim is not ripe if it rests upon contingent future events that may not occur as anticipated, or indeed may not occur at all." *Texas v. United States*, 523 U.S. 296, 300 (1998); *Thomas v Union Carbide Agric. Prods.*, 473 U.S. 568, 580–81 (1985).  Federal courts have the obligation to place the ripeness hurdle in the path of any challenger, but the contours of the hurdle are prudential and must be tailored to the facts of the case. *Abbott Labs. v. Gardner*, 387 U.S. 136, 148 (1967); *Eagle-Picher Indus., Inc. v. EPA*, 759 F.2d 905, 912–13 (D.C. Cir. 1985); *Comité de Apoyo a los Trabajadores Agricolas v. Perez*, 774 F.3d 173, 176 (3d Cir. 2014) (question of ripeness calls upon the court to exercise judgment, rather than apply a black-letter rule.).

But given that the Guidance Document imposes what its authors concede are "major" changes" to the drawback scheme (*e.g.,* those claims implicating the "mixed use" or "first filed" rules, or those affecting the important accelerated payment scheme), the Guidance Document is much more than a compilation of drawback-related "policy statements" or "interpretive rules." Defs.' Mem. 4.[3]  As the existing drawback regulations (pre- and post-TFTEA) expressly cover "all drawback claims," 19 C.F.R. § 191.0, and because 19 C.F.R. § 191.92 requires accelerated payment to authorized claimants, the suspension of the operation of these drawback regulations— in effect since February 24, 2018—is clearly ripe for judicial review.  Clearly Defendants are not faithfully applying § 191.92 in repaying "all drawback claims" to those holding accelerated payment licenses, as required.

The Government also attacks specific injuries alleged in the Complaint and in the declarations in support of Plaintiffs' Motion for a Preliminary Injunction.  The facts clearly show that before February 24, 2018—*i.e.,* before the Guidance Document took effect—CBP faithfully applied Part 191 of its regulations, including the accelerated payment provisions, to "all drawback claims."  19 C.F.R. § 191.0.  As to claims filed under TFTEA rules, the Government asserts, incorrectly, that "no such privilege exists." Defs.' Mem. 4.  Instead, "[c]laimants are still permitted to file claims and receive accelerated payment under the *old drawback statute,* if all requirements have been met." *Ibid.* (emphasis added).

First of all, there is no "*old drawback statute.*" *Ibid.* (emphasis added).  There is only 19 U.S.C. § 1313.  It was *amended* by the TFTEA, not replaced.  While the Government concedes that § 1313 "provides the statutory framework for claiming drawback," and further that the

---

[3] The Guidance Document admits the changes to the drawback regulations are "major," and section 3 of the executive summary is even titled "Major TFTEA-Drawback Changes." Compl. Ex. A, at 1.

drawback regulations are "currently codified in Part 191," it misapprehends the impact of the TFTEA on this scheme.  The Government would have this Court believe that Congress, in the TFTEA, required comprehensive rulemaking to both rewrite Part 191 and to add a new Part 190 to the regulations.  This interpretation is based on the faulty premise that the TFTEA requires comprehensive rulemaking to implement its provisions.  On the contrary, the TFTEA is by its terms self-implementing.  Indeed, Section 906(q)(1) of the TFTEA provides:

> (q) EFFECTIVE DATE.
>
> > (1) IN GENERAL.—The amendments made by this section shall—
> >
> > > (A) take effect on the date of the enactment of this Act; and
> > >
> > > (B) except as provided in paragraph (3)[providing a "transition" provision, to be exercised at the discretion of the drawback claimant], apply to drawback claims filed on or after the date that is 2 years after such date of enactment.

Expecting the changes rendered by TFTEA to be implemented by their effective date, it is no wonder that Congress "required" Treasury, in TFTEA Section 906(g) to promulgate the single calculation regulation no later than that same effective date, February 24, 2018.  *See* H.R. Rep. 114-376, at 219.  Moreover, Congress gave CBP a highly detailed blueprint for the calculation rule the legislature would consider acceptable.  This was to aid the agency's deliberations and CBP indicated it intends to follow the Congressional blueprint.[4]

Nor can there be any doubt that CBP understood February 24, 2018 to be the intended implementation date.  In a series of monthly *Drawback Simplification Newsletters* issued to the

---

[4] Plaintiffs have no quarrel with the use of the Congressionally-recommended methodology in TFTEA § 906(q)(1).

trade community between January 2017 and November 2017,[5] CBP reiterated that (emphasis added):

> The Act provides CBP with *two-years from the date of enactment to fully implement* the new law. As such the changes promulgated by the Act will not take effect until *February 24, 2018*, applying to drawback claims filed on and after that date.

The calculation rule was the *only* one which Congress identified as time-sensitive.

To the extent CBP may wish to publish conforming regulations to match the Code of Federal Regulations to the language of 19 U.S.C. § 1313, this is not a time-sensitive exercise, since it is well-established that the language of the statute trumps any regulation containing inconsistent language. *Gray v. SLC Coal Co*., 176 F.3d 182 (6th Cir. 1999) (plain language of a statute prevails over inconsistent regulation); *Wolf Creek Collieries v. Robinson*, 872 F.2d 1264, 1267 (6th Cir. 1989). In *Cargill Citro America v. United States*, 29 Ct. Int'l Trade 941 (2005), this Court noted that the language of the drawback statute, as amended pursuant to the Customs Informed Compliance and Modernization Act ("Mod Act"), *see* North American Free Trade Agreement Implementation Act, Title VI, Pub. L. 103-182, 107 Stat. 2057 (1993), governed disposition of a drawback claim filed before CBP had published conforming regulations in 1998 (Treasury Decision 98-16).

The "definitional" regulation which Congress "required" by enacted within two years pursuant to  Section 906(g) of TFTEA, respecting the calculation of refunds, thus stands on an

---

[5]    Accessible   at   https://www.cbp.gov/sites/default/files/assets/documents/2017-Nov/TFTEA-DrawbackNews_November_0.pdf (last accessed April 22, 2018). The quoted phrase was repeated verbatim in every one of the monthly newsletters. CBP ceased publication of the Newsletters after November, 2017, which appears to be the time the agency determined that it would not, in fact, published the required calculation regulation by February 24, 2018.

entirely different footing from any "conforming" regulations[6], which, Plaintiffs suspect on information and belief, make up the bulk of the mighty 450-page proposed *new* "Part 190". Failing to make this critical distinction, Defendants seem willing to largely shut down the entire drawback program until a large package of conforming regulations can be finalized—a process which took nearly five years after the last major revision of drawback standards following passage of the 1993 Mod Act.

This intent—and CBP's failure to appreciate the difference between the "definitional" regulation and mere "conforming" regulations—is evident in Defendants' litigation position, where it states:

> While Congress anticipated that the agencies would issue the regulations by February 24, 2018, it imposed no penalty or consequence should the Government require more time. … In light of the *complexity* and *significance of the issues*, the *volume of information under consideration*, and the significant progress made by the agencies, the time the Government has required to issue the regulations is not unreasonable.

Def. Mem. 5.  Citing "complexity," "significance of the issues," and the "volume of information under consideration" would perhaps be valid arguments if it were true that Congress demanded rulemaking as comprehensive as Defendants claim.  However, the definitional rule required by Section 906(g) of the TFTEA is extremely limited, requiring only the promulgation of calculation regulations.  CBP described the calculation, with extensive examples, in fewer than 6 pages in its Guidance Document. Compl. Ex. A, at 16–22.  CBP's desire to adopt a massive package of optional conforming regulations does not provide a reasonable excuse for delaying issuance of the single calculation regulation the law requires to operate.

---

[6] It is believed that, in addition to confirming regulations, the regulatory package is likely to contain other provisions "modernizing" the regulations to take account of legal changes and court decisions issued during the past two decades.

The seminal case concerning when agency action is ripe for review is *Abbott Laboratories*, *supra*, 387 U.S. 136, where the U.S. Supreme Court set out a bifurcated test with two criteria for determining the fitness of particular agency action: (1) whether the issue framed was "purely legal," and (2) whether the action is a "final agency action," within the meaning of 5 U.S.C. § 704—that is, the definite and final agency position on a particular issue.  On the question of "hardship," the Court held that the agency action must place the affected parties in a "dilemma" where "[e]ither they must comply" with the requirement and "incur the costs" thereof, "or they must follow their present course and risk prosecution."  *Id*. at 152.

On this case law, it is clear that the Plaintiffs' APA claims in this action are ripe for judicial review.  The test of "fitness" for judicial review is satisfied because the issues presented in Counts I through V are "purely legal," and require no further factual elaboration through enforcement action or otherwise.

### 1.    Counts I and II.

As the Federal Circuit recently held in *Glycine & More, Inc. v. United States*, 880 F.3d 1335 (Fed. Cir. 2018), an administrative agency may not limit the scope of operation of a duly-promulgated regulation, nor deprive persons of rights thereunder, through the promulgation of a "Guidance Document" that was not issued under the APA, with "notice and comment" proceedings, 5 U.S.C. § 553.  Yet that is precisely what CBP's "Guidance Document" does here. It effectively narrows the scope of the existing accelerated payment regulatory scheme, 19 C.F.R. § 191.92, limiting it to non-TFTEA drawback claims.  It further declares that CBP will not issue accelerated payments for TFTEA drawback claims, and effectively suspends the licenses of Plaintiffs (and thousands of others) who have applied for, and received, the right to receive

accelerated payments of drawback.  Such right to accelerated payment is secured by customs bonds.  19 C.F.R. §191.92.

Defendant asserts, incorrectly, that the Guidance Document "does not alter any rights that exist under the current regulations" with respect to accelerated payment.  Defs.' Mem. 23.  It also asserts that Plaintiffs "currently have no legal basis for accelerated payment" of claims filed under the drawback statute, 19 U.S.C. § 1313, as amended by TFTEA, *id*. at 24, implying that new rulemaking must be conducted to confer such a right.  Neither statement is true.

Section 313(*l*) of the Tariff Act of 1930, 19 U.S.C. § 1313(*l*), has, at all times relevant, contained an express Congressional delegation of authority to CBP to issue regulations governing the administration of the drawback statute.[7]  Acting pursuant to this authority, CBP has, since 1972, adopted and implemented regulations providing for accelerated payment of drawback claims to qualified claimants.  *See* Pl.'s Memo Supp. Mot. Prelim. Inj. 22–24, 41–42.  The current accelerated payment regulation, 19 C.F.R. § 191.92, provides that "[a]ccelerated payment of drawback is available under this section on drawback claims under this part, **unless specifically excepted** from such accelerated payment".  19 C.F.R. § 191.92(a)(1) (emphasis added).  The Government has pointed to no provision which "specifically excepts" drawback claims based on TFTEA substitution or timing rules from accelerated payment under the regulation.  Part 191 of the CBP Regulations, by its terms, applies to "all drawback claims," 19 C.F.R. § 191.0, and must

---

[7] Section 313(*l*), as it existed when 19 U.S.C. § 191.92 was enacted, provided:

(*l*) *Regulations*.

Allowance of the privileges provided for in this section shall be subject to compliance with such rules and regulations as the Secretary of the Treasury shall prescribe, which may include, but need not be limited to, the authority for the electronic submission of drawback entries and the designation of the person to whom any refund or payment of drawback shall be made.

be presumed to include drawback claims to which the amendments made by TFTEA apply.  **"All" means "all."**

Section 191.92 of the CBP Regulations also contains detailed procedures whereby individual drawback claimants may be licensed[8] in advance by CBP to receive accelerated payments of all future drawback claims.  These procedures require accelerated payment licensees to provide extensive information, including *inter alia*, statements about the "[t]ypes of drawback covered by the application,"19 C.F.R. § 191.92(b)(1)(vi), and to provide a "certification, signed by the applicant, that all applicable statutory and regulatory requirements for drawback will be met," *id*. § 191.92(b)(3), together with a surety bond in an amount deemed acceptable by CBP, *id*. § 191.92(d).

Thus, Section 191.92, having been enacted pursuant to a specific statutory directive, has the force and effect of law.  *Chrysler Corp. v. Brown*, 441 U.S. 281, 302–03 (1979); *Gen. Eng'g & Mach. Works v. O'Keefe*, 991 F.2d 775 (Fed Cir. 1991).  Contrary to Defendants' assertions, the Plaintiffs in this action do have "rights under existing regulations," and do have a "legal basis for accelerated payment."  A claimant holding accelerated payment rights for substitution unused merchandise drawback under 19 U.S.C. § 1313(j)(2), for instance, holds such rights regardless of whether its claim is based on the pre-TFTEA substitution standard of "commercial interchangeability" or the TFTEA standard of common 8-digit tariff classifications.  Whereas,

---

[8] That accelerated payment permits are "licenses" is made clear by the adoption of 5 U.S.C. § 558(c)-compliant revocation and suspension procedures in the governing regulation, 19 C.F.R. § 191.92, and by this Court's decision in *The Pillsbury Co. v. United States*, 18 F. Supp. 2d 1034 (Ct. Int'l Trade 1994).  *See also* Pl.'s Memo Supp. Mot. Prelim. Inj. 19, 24–29.

Defendants have pointed to no law or regulation suggesting otherwise,[9] Plaintiffs note the incontrovertible, all-encompassing language of 19 C.F.R. § 191.0.

And Plaintiffs' accelerated payment rights under 19 C.F.R. § 191.92 have unquestionably been abrogated by the Guidance Document, which had immediate effect beginning February 24, 2018—the day that TFTEA's drawback provisions entered into force.  The Guidance Document, in effect, states that CBP is immediately curtailing the operation of Part 191, and § 191.92 specifically, to drawback claims other than those filed in accordance with the TFTEA amendments.[10]   There is simply no basis for such a narrowing of the scope of the existing regulation, or of Plaintiffs' rights thereunder.

In this respect, the claims set out in Counts I and II of the Complaint are unquestionably ripe for judicial review.  Claimant Plaintiffs have established, legally-cognizable rights to receive accelerated payment of their drawback claims.  Those rights are abrogated, with respect to claims filed under TFTEA standards, by the Guidance Document, effective February 24, 2018.  Claimant Plaintiffs are being deprived of payments to which they are entitled under 19 C.F.R. § 191.92, suffering irreparable economic harm, and drawback broker Plaintiffs, whose revenues are based on refunds received by claimants, are suffering reduced cash flows.  Those losses, currently

---

[9] CBP's Guidance Document states, incorrectly, that "AP [accelerated payment] privileges granted under the authority of 19 C.F.R. Part 191 will not be in accordance with the TFTEA-Drawback legal requirements," Compl. Ex. A at 10, although it points to no TFTEA legal requirement respecting accelerated payment. In this regard, the Guidance Document implicitly states that CBP is limiting the scope of 19 C.F.R. Part 191, to less than "all" claims for drawback, *see* 19 C.F.R. §191.0.

[10] Effective February 24, 2019, CBP indicates, all drawback processing will cease, and CBP will become nothing more than a "drop box" for drawback claimants who wish to stop the running of statutory limitations on their claims. The need for such a cessation is questionable, especially since the basis for calculating direct identification drawback claims, *see* 19 U.S.C. §§ 1313(a) and 1313(j)(1), will not be changed by TFTEA, and the lack of a calculation regulation for substitution claims should have no effect whatsoever on the calculation of drawbacks in those cases.

irreparable, will become absolute on February 24, 2019, when only TFTEA-based drawback claims may be filed—and none will be processed.

This action raises a procedural challenge to CBP's February 24, 2018 abrogation of Plaintiff' rights, charging that such abrogation was carried out "without observance of procedure required by law," in violation of 5 U.S.C. § 706(2)(D). CBP has effectively rewritten 19 C.F.R. § 191.92 to limit the scope of its operation to non-TFTEA drawback claims. Plaintiffs charge that this re-writing is unlawful, since CBP has rewritten the regulation by means of a Guidance Document, rather than through formal, APA-required notice and comment rulemaking pursuant to 5 U.S.C. § 553. *See Glycine & More*, *supra*, 880 F.3d 1335. CBP has acted unlawfully, its unlawful actions have been in effect since February 24, 2018, and the adverse impacts are being felt by Plaintiffs, who are "aggrieved by agency action," and have standing to seek redress under the APA.

As stated, the question of whether agency action is "ripe" for adjudication invites a two-part inquiry: first, are the issues presented ripe for judicial resolution; second, can the court assess a hardship to the parties if relief is denied. *Abbott Labs.*, 387 U.S. at 149. The ripeness doctrine seeks to prevent the courts, through avoidance of premature adjudication, from entangling themselves in abstract disagreements over administrative policies and also to protect the agencies from judicial interference until an administrative decision has been formalized and its effects felt in a concrete way by the challenging parties." *Id.* at 148.

CBP has narrowed the scope of a regulation having the force and effect of law, using a Guidance Document instead of an APA-compliant rulemaking proceeding. This action is not proposed, but currently in force. CBP is refusing to apply 19 U.S.C. § 191.92 to qualified drawback claimants filing TFTEA claims, and Plaintiffs are being denied payments as a result.

15

The action is both "final," in the sense that it has been implemented, and the Court is in a position to assess the adverse impact on affected persons.  The question posed—could CBP do what they did, the way they did it?—has ripened into a clear case or controversy, in which aggrieved Plaintiffs have articulated a strong procedural challenge grounded in the APA.

The regulations in question are unambiguous.  Section 191.0 of the CBP Regulations indicates that the procedures in that Part, including in 19 C.F.R. § 191.92, apply to "all" drawback claims.  **Again, "all" means "all."**  The controversy is framed exactly as it was in *Glycine & More*:

> Assuming Commerce wished to rewrite the regulation in this manner [*i.e.,* via informal guidance document], could it do so in this way? The answer is no. Because the regulation's meaning is clear, no deference is warranted. Deferring to Commerce's position "would be to permit the agency, under the guise of interpreting a regulation, to create de facto a new regulation."

880 F.3d at 1345 (citing *Christensen v. Harris Cnty.*, 529 U.S. 576, 588 (2000)).  Here, Defendant argues that because its Guidance Document is merely designed as guidance to assist the trading community of procedures to be following during the (likely years-long) period until final "implementing regulations are operational," Defs.' Mem. 12, and may be subject to change during that time, it is not "final agency action" ripe for judicial review.  However, it is clear that:

> The possibility of recision or modification is not enough to preclude judicial review. While the [regulatory] amendment remains in effect, it presents legal issues of whether it was properly promulgated and whether creditors are offering home secured credit without the consumer rights secured by the [Truth in Lending Act].

*Consumers Union v. Miller*, 84 F.R.D. 240, 243 (D.D.C 1979).  The court in *Consumers Union* also noted that the pending publication of a *Notice of Proposed Rulemaking* which affected the rule in question did not render the challenge to the regulation unripe, noting that (1) the final rulemaking might leave the challenged rule unchanged, and (2) having the opportunity to comment

in a rulemaking proceeding is not the equivalent of an administrative remedy a litigant is required to exhaust before seeking judicial intervention regarding a currently rule.  *Ibid.*

Thus, (1) claimant Plaintiffs have a protectable legal right in receiving accelerated payment of drawback under regulations which have the force and effect of law, and which by their terms apply to "all" drawback claims, (2) Defendant CBP has curtailed the operation of those regulations without following procedures required by law and (3) Plaintiffs are being denied accelerated payments to which they are otherwise entitled by licenses whose operations have been suspended. Nothing more is required for the case to be ripe for adjudication with respect to the matters set out in Counts I and II of the Complaint.[11]

In this case, the events giving rise to the claims in Counts I and II of the Complaint *have already been taken by CBP, are in effect,* and are depriving Plaintiffs of payments to which they are entitled by regulation.  Nothing more is required to make the claim ripe, and there is no guarantee that future rulemaking would do anything to change the current situation.

### 2.    Counts III and IV.

Counts III and IV of the Complaint also set out procedural challenges under the APA which are ripe for judicial review.  Count III challenges the adoption, in the Guidance Document, of a "First Filed" rule, which is described by CBP as a "Major TFTEA Drawback Change [], and which proclaims certain imported duty paid merchandise, otherwise eligible for drawback, as ineligible

---

[11] The Government notes (Defs.' Mem. 22–23) that a guidance document might be considered a binding, immediately reviewable rule if it "narrowly limit[s] administrative discretion," citing *Ass'n of Flight Attendants v. Huerta*, 785 F.3d 710, 717 (D.C. Cir. 2015) and *Community Nutrition Institute. v. Young*, 818 F.2d 943, 948 (D.C. Cir. 1987). CBP's Guidance Document certainly "narrowly limits administrative discretion," denying CBP officials **any** discretion to pay accelerated payment of drawback claims filed under TFTEA rules. It also requires rejection of all TFTEA claims for which accelerated payment is requested. Compl. Ex. A, at 8 ("TFTEA-Drawback claims filed in ACE with an indicator to request AP privileges will not be accepted.").

for designation in a TFTEA substitution drawback claim.  Count IV challenges the Guidance Document's proclamation of a "Mixed Use" rule, which states that if merchandise contained on an import entry line item was previously designated for drawback in a direct identification drawback claim, the remaining merchandise on the entry line may not thereafter be designated as the basis for a substitution drawback claim.

Both the "First Filed" and "Mixed Use" drawback rules are legislative-type rules which impose new substantive requirements on drawback claimants. They are subject to review under the APA as having been promulgated "without observance of procedure required by law", since they were not implemented through notice and comment APA rulemaking, as required by 5 U.S.C. § 553.  The rules are legislative because they both (1) apply to all persons engaged in a particular activity, (2) are not self-enforcing, (3) apply prospectively only and (4) reflect policy considerations of a generalized nature which affect an industry as a whole.  *See Rosenthal v. Bagley*, 450 F. Supp. 1120 (N.D. Ill. 1978).  That they are proclaimed in an informal Guidance Document is of no matter. The nature of the rule governs their designation as legislative.  *Minard Run Oil Co. v. USFS*, 670 F.3d 236 (3d Cir. 2011).  As promulgated, they constituted final agency action, because the Guidance Document specified penalties for non-compliance; rejection of drawback claims which did not conform to the "First Filed" rule, and denial of drawback claims which did not conform to the "Mixed Use" rule.  *See* Compl. Ex. A, at 14.

Since this action was initiated, CBP has taken action to amend its Guidance Document, issuing a Version 3.0, which indicates that drawback claims filed in contravention of these rules will not be rejected or denied, but will be accepted and held for processing "[a]fter the finalized regulations are implemented," *see* Defs.' Mem. 27.  CBP further indicates that claims filed during the period prior to adoption of final regulations can be perfected to reflect whatever policy is

adopted in the final regulation, which presumably will be adopted using APA notice and comment rulemaking procedures. In other words, CBP has not withdrawn the legislative "First Filed" and "Mixed Use" rules contained in the Guidance Document, but has elected to stay their application until after final regulations are issued (and assuming these rules appear in the final regulation): "CBP is not deciding, let alone denying, any claims prior to the implementation of the final regulations," *see id.* at 27.

This action challenges CBP's adoption of the "First Filed" and "Mixed Use" without following required APA rulemaking procedures. CBP has now indicated that the rules will not be applied, except after such rulemaking is conducted. We assume (but Defendants do not specify) that the proposed NPRM will contain proposals relating to "First Filed" and "Mixed Use," and provide opportunity for public comment regarding same. If CBP will agree to entry of a final injunction or enforceable stipulation specifying that these rules will not be applied or enforced except after APA Rulemaking,[12] Plaintiff agrees that this would moot Counts III and IV of the Complaint.

### B.   Plaintiffs have Standing as to Counts III and IV.[13]

Defendant argues (at 29–31) that Plaintiffs lack standing to bring Counts III and IV of the Complaint, suggesting that there is no actionable "case or controversy" because none of the Plaintiffs have suffered the rejection or denial of drawback claims which are contrary to the legislative-type "First Filed" and "Mixed Use" rules which are set out in CBP's "Guidance Document." The Government also argues that no cause of action may be stated since CBP "is not

---

[12] The undertaking in the amended Guidance Document is by itself insufficient, since as CBP indicates, the document is subject to change prior to the adoption of final regulations.

[13] The Government does not seem to contest Plaintiffs' standing to bring Counts I, II, and V; and therefore, Plaintiffs response is limited to Counts III and IV.

processing or deciding any TFTEA drawback claims prior to the promulgation of the final regulations." *Id*. at 30.[14]  In effect, because CBP is not finally denying any drawback claims based on the "First Filed" and "Mixed Use" rules, Defendants contend that Plaintiffs cannot demonstrate any "injury in fact" respecting them.[15]  However, Plaintiffs have both Constitutional and prudential standing as to both counts, and indeed, all the counts of their Complaint.

Standing is not a matter of common law; it is granted by statute.  The APA, under which this action is brought, incorporates the broad "zone of interests" test under which an adversely affected or aggrieved party need only establish that the zone of interests he or she seeks to protect is arguably within the zone of interest to be protected by the statute under which the plaintiff sues. *Ass'n of Data Processing Serv. Orgs., Inc. v. Camp*, 397 U.S. 150, 153–54 (1970).  To establish Article III Constitutional standing, a plaintiff must demonstrate (1) an actual and threatened injury which is (2) fairly traceable to the challenged action, and (3) a substantial likelihood that the relief requested will redress or prevent its injury.  *Adland v. Ross*, 307 F.3d 471, 477–78 (6th Cir. 2000). Even an allegation of future injury suffices if the threatened injury is certainly impending or there

---

[14] Defendant's own language underscores the unreasonableness of its position generally. It is in effect an admission that CBP has shut down the duty drawback program with respect to TFTEA claims until "promulgation of the final regulations", which, as noted below, is likely to take several years. By February 23, 2019, when the "transition year" provided in TFTEA ends, and all claims are subject to TFTEA claims, CBP will have shut down the drawback program altogether, making available an "in box" where claims can be filed, but will not be "process[ed] or decid[ed]." *See* Defs.' Mem. 30.

One can only imagine the tumult if the responsible government agencies decided that they would accept, but not process, say, Social Security or Veterans' Benefit claims, for an extended time until discretionary rulemaking could be performed.

[15] As noted *supra*, Defendant's decision to stay enforcement of the "First Filed" and "Mixed Use" rules would moot Counts III and IV of the Complaint, if this decision could be incorporated in a final injunction or enforceable stipulation.  The government's allegation of lack of standing presumably indicates that it would not be amenable to such a disposition, so we address its standing claims here.

is a substantial risk that the harm will occur.  *Susan B. Anthony List v. Dreihaus,* 134 S. Ct. 2334, 2341 (2014); *see also Clapper v. Amnesty Int'l USA*, 133 S. Ct. 1138, 1147, 1150 n.5 (2013). Plaintiffs' injury is underway.

This is a case where the Plaintiffs seek to vindicate their procedural rights under the APA. For Counts III and IV, the gravamen of Plaintiffs' challenge is that substantive, legislative "First Filed" and "Mixed Use" limitations on the statutory right to drawback have been imposed without observance of the "notice and comment" rulemaking proceedings of the APA.  While CBP has temporarily stayed enforcement of these rules, it has not withdrawn the rules themselves.[16]

"In many cases, a plaintiff's standing to sue is self-evident."  *Banner v. Sibelius*, 797 F. Supp. 2d 97, 108 (D.D.C. 2011) (quoting *Sierra Club v. EPA*, 292 F.2d 895, 900 (D.C. Cir. 2002)). It is self-evident because "the complainant is the object of the action (or foregone action) at issue— as is usually the case in review of a rulemaking and nearly always in review of an adjudication. *Id*. at 900 (quoting *Lujan v. Defenders of Wildlife*, 504 U.S. 555 (1992)).  Plaintiffs are drawback claimants and licensed brokers who file claims on their behalf.  The "First Filed" and "Mixed Use" rules would deny them earned drawback payments by declaring certain imports ineligible for drawback.[17] Their standing is predicated on CBP's issuance of regulations without observance of procedures required by law; that is all that is required.

---

[16] Nor have Defendants represented that the so-called "First Filed" or "Mixed Use" rules will be formally proposed in the promised forthcoming Part 190 rulemaking. The rules having been imposed in the Guidance Document, it does not necessarily follow that CBP would see the need to propose them again.

[17] It should be noted that Congress, in enacting TFTEA, did not place any limitations on the eligibility of duty-paid imports to be designated for drawback. To the extent CBP is imposing such limitations, this does not appear to be a matter of implementing Congressional intent, but rather of administrative convenience. Whether administrative convenience is an adequate reason for limiting the statutory right to drawback is definitely a matter which should be determined through notice and comment rulemaking (and, if necessary, litigation which seeks judicial review of the agency record in such a rulemaking proceeding).

In this regard, the doctrine of "procedural rights standing" confers standing on Plaintiffs respecting Counts III, IV, and the other counts of the Complaint.   Under this doctrine, "the violation of a procedural right can constitute injury in fact, so long as the procedures are designed to protect some threatened concrete interest [of the plaintiff].   That is the ultimate basis of his standing." *Iowa League of Cities v. EPA*, 711 F.3d 844, 870–71 (8th Cir. 2013).   As noted in *Iowa League of Cities*, "[r]egulated industries have a concrete interest in 'avoiding regulatory obligations above and beyond those that can be statutorily imposed on them." *Id*. at 871.   The same court went on to note that:

> … notice and comment procedures for … rulemaking … were undoubtedly designed to protect the concrete interests of such regulated entities by ensuring that they are treated with fairness and transparency and due consideration and industry participation.

*Ibid*. (citing *Chrysler Corp. v. Brown*, 441 U.S. 281, 316 (1979)).

Prudential standing to assert procedural protections depends on whom the procedural protections were designed to protect.   *Dismas Charities Inc. v. DOJ*, 401 F.3d 666, 678 (6th Cir. 2005).   "Notice and comment rulemaking gives regulated parties the important opportunity to argue that the agency's policy is wrong before the policy is adopted." *Id*. at 677.

The "First Filed" and "Mixed Use" rules challenged in Counts III and IV of the Complaint unquestionably impose conditions and limitations on drawback claimants, including the Plaintiffs here.   The rules were announced without any warning to plaintiffs or others in the trading community, and there was no opportunity for public participation. That this litigation induced defendant to stay their application, without more, does not eliminate the procedural violation on which Plaintiffs sue.

Plaintiffs have standing to raise the procedural challenges set out in Counts III and IV of the Complaint, and indeed, in all counts of the Complaint.

### C.      All Counts State Claims Upon Which Relief Can Be Granted by this Court.

In addition, Defendants allege that Plaintiffs have failed to state claims upon which relief can be granted, and that this action should be dismissed pursuant to Rule 12(b)(6).   As demonstrated herein, Plaintiffs have stated actionable claims with respect to all five counts in their Complaint.

At the outset, we wish to note one unusual circumstance respecting Defendants' Motion to Dismiss.  Defendants assert that Plaintiffs have failed to state causes of action on which relief can be granted.  In discussing the factors which govern the decision on whether to grant Plaintiff's Application for a Preliminary Injunction, the Defendants do not address the question of whether Plaintiffs have a "likelihood of success on the merits." Obviously, if the claims are subject to dismissal under Rule 12(b)(6), Plaintiff's likelihood of success on the merits would be zero. However, the Defendants never *specifically* address the question of Plaintiffs' "likelihood of success on the merits," should the Court deny Defendants' Motion.  We assume, therefore, that if the claims survive the Rule 12(b)(6) motion, Defendants do not contest that Plaintiffs have a likelihood of success on the merits.

Having made this preliminary observation, we turn to Defendant's Rule 12(b)(6) assertions.  The Complaint sets forth claims upon which relief can be granted by alleging the following:

| | |
|---|---|
| **Count I** | Alleges that the Guidance Document unlawfully amends, supersedes, or revokes the CBP regulations applicable to drawback claims, particularly accelerated payment drawback claims, in violation of the APA. |
| **Count II** | Alleges that CBP's refusal to process accelerated payments of drawback claims brought under TFTEA standards constitutes the suspension or revocation of one or more licenses without observance of legally required procedures, in violation of the APA. |

| | |
|---|---|
| **Count III** | Alleges that CBP violated the APA by promulgating a substantive rule, known as the "first filed" rule, with immediate effect, without observing the "notice and comment" and other rulemaking procedures mandated by 5 U.S.C. § 553. |
| **Count IV** | Alleges that CBP violated the APA by promulgating a substantive rule, known as the "mixed use" rule, with immediate effect, without observing the "notice and comment" and other rulemaking procedures mandated by 5 U.S.C. § 553. |
| **Count V** | Alleges that Defendant Steven Mnuchin, in his official capacity as the U.S. Secretary of the Treasury, has failed to observe procedures required by law, in violation of the APA, by failing to promulgate, within a reasonable time, the *limited* rulemaking mandated by Section 906(g) of the Trade Facilitation and Trade Enforcement Act of 2015, Pub. L. 114-125, 130 Stat. 122 (2016) ("TFTEA"), which only requires regulations addressing the calculation of drawback claims. |

Not only do Plaintiffs meet the pleading standard under USCIT R. 12(b)(6), but Plaintiffs are likely to succeed on the merits as to each of their five claims.

### 1.   Counts I and II.

In Count I, Plaintiffs allege that CBP has wrongfully curtailed the operation of the regulation providing for accelerated payment of drawback; in Count II, Plaintiffs allege that curtailment amounts to the suspension of their APA-protected licenses, without observance of license suspension or revocation procedures required by the APA, *see* 5 U.S.C. § 558(c).  After noting that CBP has not curtailed the right to accelerated drawback payments for claims submitted under the pre-TFTEA standard—which Plaintiffs never allege—the sum of Defendants' argument is that "CBP has not suspended or revoked any license for accelerated payment under the new law because no such privilege has yet been created," Defs.' Mem. 32.

As explained above, however, part 191 expressly covers "all drawback claims," 19 C.F.R. § 191.0, not just those claims under the pre-TFTEA standard.  19 C.F.R. § 191.92, which mandates

accelerated payment to authorized claimants, is within part 191, and itself provides that "[a]ccelerated payment of drawback is available under this section on drawback claims under this part, unless specifically excepted from such accelerated payment."   19 C.F.R. § 191.92(a)(1). Unless and until CBP validly changes the scope of part 191 to apply only to all drawback claims submitted under the law as it existed before TFTEA, or to affirmatively make a specific exception from accelerated payment for TFTEA claims, part 191 continues to govern any drawback claim submitted and accelerated payment remains available as of right to those authorized, including Plaintiffs.   Plaintiffs have indeed stated a plausible claim that Defendants have reduced the operation of part 191.

With regard to Count II specifically, Defendants do not ever argue that Plaintiffs fail to state a claim that CBP's announced suspension of their accelerated payment privileges amounts to the suspension of a license without observance of procedure required by the APA.  Again, while their argument is that there is no accelerated payment privilege for claims made under the TFTEA standard, nowhere do Defendants contest Plaintiffs' claim that any accelerated payment privileges themselves constitute a license under the APA.  In fact, the brief explicitly sets the issue aside, prefacing its arguments with the phrase "to the extent that accelerated payment under 19 C.F.R. § 191.92 amounts to a license under the APA."  Defs.' Mem. 32.  Therefore, if the Court finds that the predicate Count I is viable in that Plaintiffs have stated a claim that their accelerated payment privileges have been suspended, the Court must find that Plaintiffs have stated Count II sufficiently as well for the purpose of the Motion to dismiss.

## 2.      Counts III and IV.

Counts III and IV allege that Defendants violated the notice-and-comment rulemaking provisions of the APA by imposing substantive, legislative-type rules without observance of

procedure required by law, *see* 5 U.S.C. § 558.  Specifically, the "First-Filed" and "Mixed-Use" Rules set out in CBP's Guidance Document "create a new law, rights or duties," *General Motors Corp. v. Ruckelshaus*, 742 F.2d 1561, 1565 (D.C. Cir. 1984) (*en banc*), and are (i) applied to all persons engaged in drawback; (ii) are not self-enforcing; (iii) apply prospectively only; and (iv) reflect policy considerations of a generalized nature that affect an industry as a whole.  *See e.g.*, *Rosenthal v. Bagley*, 450 F. Supp. at 1123.  The rules are substantive because "in the absence of the rule[s] there would not be an adequate legislative basis for enforcement action or other agency action to confer benefits or ensure the performance of duties." *Am. Mining Cong. v. MSHA*, 995 F.2d 1106, 1112 (D.C. Cir. 1993).  *See* 5 U.S.C. § 553(b)(B).

The First-Filed and Mixed-Use Rules are legislative in nature because they create restrictions on the right to designate merchandise for drawback.  These restrictions, apparently adopted for reasons of administrative convenience, impose conditions not found in the statute.  It is difficult to imagine rules which could be more legislative in nature.  Plaintiffs incorporate by reference the analysis found in their *Memorandum of Points and Authorities* in support of their application for the preliminary injunction (at 14–18)—an analysis which Defendants do not address.

In its Motion to Dismiss, Defendants refer to these rules as "provisional placeholders" designed to govern the handling of drawback claims "until the regulations are finalized."  Defs.' Mem. 34.  First, we note that the single definitional regulation which Congress, in Section 906(g) of the TFTEA, required Treasury to adopt dealt only with the basis for calculating the amount of drawback to be paid in respect of TFTEA substitution claims.  It neither authorized nor directed CBP to designate any imports as ineligible for drawback.  Second, if a "provisional placeholder" were required, the APA allows an agency to adopt an "interim final" rule without prior notice and

comment, but only in cases where providing notice and comment is "impracticable, unnecessary, or contrary to the public interest." 5 U.S.C. § 553(b).  CBP did not even bother to invoke this procedure (and likely could not satisfy the statutory conditions for doing so).

Defendant notes (at 34) that "interpretive" rules are not subject to notice-and comment rulemaking, but fails to explain how the "First Filed" and "Mixed Use" rules could be considered "interpretive."  An interpretive rule is one which reminds affected parties of existing duties, interprets a statute to guide the agency in the performance of its duties, states how an agency construes a statute or regulation, or describes factors which the agency will look at in future adjudications without binding the agency to a result.  *See Syncor Int'l Corp. v. Shalala*, 127 F.3d 90 (D.C. Cir. 1997).  The "First Filed" and "Mixed Use" rules establish new duties, rather than reminding drawback claimants of existing ones.  They do not interpret the drawback statute, since the statute is silent on the points covered by these rules.  They do not state how the agency construes a statute or regulation, since no specific statutory provision is identified and regulations are not yet in existence (*i.e.,* the point of this litigation).  Finally, they do not describe factors to consider future determinations; instead, they impose flat restrictions.

"Only legislative rules may legally bind parties, and to the extent that nonlegislative rules do so, regulated entities and the public are deprived of an opportunity to participate in the rulemaking process through notice and comment."  Fraser, *Interpretive Rules: Can the Amount of Deference Afforded Them Offer Insight into the Procedural Inquiry?,* 90 Boston U. L. Rev. 1303, 1309 (2010).  Courts have decried agency attempts to bind the public through guidance documents and other pronouncements which fail to undergo APA promulgation procedures, noting that, in such instances "[l]aw is made, without notice and comment, without public participation, and without publication in the Federal Register or the Code of Federal Regulations."  *Appalachian*

*Power Corp. v. EPA*, 208 F.3d 1015 (D.C. Cir. 2000).  That CBP may have voluntarily and temporarily stayed full enforcement of these rules—indicating that it will accept claims for filing despite these restrictions, but will not process and deny the claims—does not detract from the nature of the rules as legislative.

Plaintiffs have stated a claim under the APA on which relief can be granted with respect to Counts III and IV of the Complaint.

### 3.     Count V.

In Count V, Plaintiffs have clearly set out a claim for relief under the APA, 5 U.S.C. § 706(1), which empowers a reviewing court to determine and compel agency action "unlawfully withheld or unreasonably delayed."   Whether an agency delay is "unreasonably delayed" is determined by a review of the administrative record before the agency, and the application of the "*TRAC* Factors," as set out in *Telecommunications Research and Action Center v. FCC*, 750 F.2d 70, 80 (D.C. Cir.1984) ("*TRAC*").  To survive the instant Motion to Dismiss, Plaintiffs must only allege facts which, if accepted as true, make out a "plausible" claim that the Plaintiffs are entitled to the relief requested.  The Government's brief on this point begins by highlighting one non-issue, and continues by making a serious mischaracterization of the nature of the Complaint.

First, the Government notes (at 36) that where a statute does not specify a coercive sanction for the Government's noncompliance with a deadline given the Government, the federal courts will not impose their own coercive sanction, citing *United States v. James Daniel Good Real Property*, 510 U.S. 43, 63 (1993).  Plaintiffs do not dispute that the two-year statutory deadline is to be treated as directory, and do not seek imposition of any coercive statutory sanction, rendering this a "non-issue."

That a deadline imposed on an agency may be directory does not, however, end the inquiry, or insulate the Government's failure to meet the deadline from judicial review.  The APA provides aggrieved parties with a remedy at law for unreasonable agency delay.  5 U.S.C. § 706(1).  As the Government concedes (at 39), when a court reviews the agency record to determine the reasonableness of delay, one of the *TRAC* factors to be considered specifies that "where Congress has provided a timetable or other indication of the speed with which it expects the agency to proceed in the enabling statute, that statutory scheme may supply content for this rule of reason." *TRAC*, 750 F.2d at 80.  By alleging in the Complaint that Treasury has failed to follow the Congressional timetable, Plaintiffs have stated a plausible claim that agency delay is unreasonable under the APA.

Second, Defendant incorrectly asserts (at 35) that, to the extent Count V of the Complaint seeks a judicial review of the reasonableness of Treasury's inaction, the Complaint should be treated as seeking a writ of mandamus, and judged by the same standards by which mandamus applications are judged.  This is wrong.  Defendants explain that writs of mandamus are extraordinary equitable remedies available only where the defendant has a clear duty to perform an act in favor of the applicant, and the applicant has no other adequate remedy.  But this is clearly not the case here.  This action, including Count V of the Complaint, is an action at law under the APA, and seeks a purely legal remedy—namely review of the delay on the basis of the agency's record to determine whether Treasury's delay is "unreasonable."  5 U.S.C. § 706(1).[18]

---

[18] That Plaintiffs do not seek preliminary injunctive relief with respect to Count V of the Complaint is hardly a concession that they are seeking a writ of mandamus, *see* Defs.' Mem. 35. Rather, it is an acknowledgment that the two-year deadline imposed on Treasury by Section 906(g) of the TFTEA is considered directory, and that plaintiff's entitlement to relief is grounded in law, as set out in 5 U.S.C. § 706(1).

Neither case cited by Defendant arose under the APA, and neither is apposite. *Timken Co. v. United States*, 893 F.2d 337 (Fed. Cir. 1990), arose from a review of an antidumping determination under Title VII of the Tariff Act of 1930, 19 U.S.C. § 1516a *et seq.*, a regulatory scheme that is not subject to the APA.  As the Tariff Act provided no legal remedy for the relief sought in *Timken*—publication of a ten-day notice of a court decision not in accordance with an agency finding—the plaintiff proceeded by mandamus to compel the publication as the statute gave a clear right to the remedy sought.  Similarly inapposite, *Cheney v. U.S. District Court*, 542 U.S. 367 (2004), arose under the Federal Advisory Committee Act, and the writ of mandamus sought was to block a court-issued discovery order—for which no remedy at law was available.

In this case, Plaintiffs have a clear statutory right to a review, based on the agency record, of whether Treasury has "unreasonably delayed" the publication of the single calculation regulation which Congress directed.[19]  The Complaint pleads facts which, accepted as true, show that the Plaintiffs have a plausible claim to relief under the APA.  Specifically, the Complaint alleges that the regulations were not issued within the time prescribed by Congress, which the Government concedes, and Plaintiffs' application for a preliminary injunction notes that, as a consequence, the interests of Plaintiffs, the regulated class, are seriously prejudiced by the delay,

---

[19] The Government appears to have buried this regulation in a much larger package of mostly discretionary proposed rules – the so-called "part 190" to the drawback regulations. Plaintiffs take no position on the timing of enactment of any rule other than the calculation rule required by TFTEA § 906(g). To the extent Treasury slowed the issuance of the one regulation that Congress mandated be enacted within two years by attaching it to a larger, slower-moving package of discretionary rule, Plaintiffs would submit Treasury's actions are arbitrary, capricious and not in accordance with law.

two of the factors examined under a *TRAC* analysis.  These and the other *TRAC* factors can only be analyzed under the APA based upon the record to be filed with the Court for review.[20]

## II.     INJUNCTIVE RELIEF IS WARRANTED.

The entry of a preliminary injunction is required to preserve the status quo during this litigation and to prevent the Plaintiffs from suffering irreparable, immediate, and nonspeculative harm.  To prevail on such a motion, a petitioner must demonstrate that (i) it will be immediately and irreparably injured; (ii) there is a likelihood of success on the merits; (iii) the public interest would be better served by the relief requested; and (iv) the balance of hardship on all the parties favors the petitioner.  *Winter v. Natural Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008).  Courts evaluate requests for a preliminary injunction on a "sliding scale," where "the more the balance of irreparable harm inclines in the plaintiff's favor, the smaller the likelihood of prevailing on the merits he need show in order to get the injunction."  *Qingdao Taifa Grp. Co. v. United States*, 581 F.3d 1375, 1378–79 (Fed. Cir. 2009) (citations omitted).  Here, the requirements for injunctive relief are wholly satisfied.

### A.     Likelihood of Success on the Merits

As noted *supra*, Defendants do not address this factor in the injunction analysis, except to the extent they assert that plaintiffs have failed to assert claims on which relief may be granted. But the standard under Rule 12(b)(6) and for a preliminary injunction differ, and Defendants do not separately address the latter.  In particular, Defendants never address the question of likelihood of success on the merits in the event Plaintiff's claims survive its motion to dismiss.  This is an

---

[20] In this regard, the Government's attempts to justify the reasonableness of the admitted delay, Defs.' Mem. 39–42, on the basis of counsel's unsupported assertions, rather than on the basis of the agency record, should be disregarded. It is impossible, for instance, for the Court to make judgments on the "immense complexity of the task at hand," *id.* at 39, without see what the task is (or what Treasury imagines it to be). That is the purpose of review on the record.

apparent concession that, were Plaintiffs found to have stated valid claim in Counts I through IV, Plaintiffs are also likely to succeed on the merits.  This would weigh heavily in favor of granting the prayed-for injunction.

### B.      Plaintiffs Will Be Irreparably Harmed Absent Issuance of an Injunction

Plaintiffs have established, through testimonial evidence, that they will suffer irreparable injury absent the grant of injunctive relief.  Drawback claimant Plaintiffs, who rely upon drawback for cash flow, and to make export sales profitable, have lost access to this cash resource.  Plaintiff service providers, whose income is dependent on the receipt of drawback refunds by their clients (accounting for 93 to 100% of Plaintiffs' revenues, in certain cases), are threatened with insolvency.  Drawback refunds, when ultimately paid, are paid without interest (as the government readily concedes), so all Plaintiffs suffer are discrete, nonspeculative, and immediate loss in use of funds.  These damages are irreparable since this Court cannot compensate them for these losses. Defendants do not dispute this.

Instead, Defendants suggest that the Plaintiffs may, during the transition year, continue to seek accelerated payment of drawback by filing non-TFTEA drawback claims.  There are two major problems with this suggestion.

First, many claims which may be eligible for drawback under TFTEA might not be eligible for drawback under pre-TFTEA rules.  Take for example, an importer of watches who has 30 models of watches on an entry line item, all subject to the same 8-digit classification.  It may have export activity regarding all 30 models, and TFTEA would allow it to claim drawback on all 30. It may have only exported two models of watches which are "commercially interchangeable" with models on the entry line item. Its accelerated payment and ultimate refund under the pre-TFTEA standard of "commercial interchangeability," would be miniscule, compared to its TFTEA refunds,

determined on the basis of 8-digit tariff numbers.  Second, under the government's proposed "First Filed" and "Mixed Use" rules, were a plaintiff to claim pre-TFTEA drawback on those 2 eligible watch models, the remaining 28 models on the entry line item would become ineligible for designation as the basis of drawback on a TFTEA claim.  The Government's options are no options at all[21].

In addition, the Government asserts that it will continue to suspend the payment of accelerated drawback claims under TFTEA until final regulations are issued.  However, history teaches that the interval between the publication of a Notice of Proposed Rulemaking (NPRM) on a major regulatory CBP initiative, and the issuance of final regulations, typically takes years.  A review of recent CBP regulatory initiatives indicates the following time intervals for finalizing rulemaking:

| Regulation | Re: | Proposed | Citation | Final Rule | Citation | Time |
|---|---|---|---|---|---|---|
| 19 C.F.R. 149.1 | Definition of Importer Security Filing Importer | 7/6/2016 | 81 FR 43961 | 4/12/2018 | 83 FR 15736 | 1Y 9M |
| 19 C.F.R. 10, 24, 102, 123, 128, 141, 143, 145, 148 | Informal Entry Limit and Removal of a Formal Entry Requirement | 10/28/2011 | 76 FR 66875 | 12/6/2012 | 77 FR 72715 | 1Y 1M |
| 8 C.F.R. 231, 19 C.F.R. 122 | Advance Information on Private Aircraft Arriving and | 9/18/2007 | 72 FR 53394 | 12/18/2008 | 73 FR 68295 | 1Y 3M |

---

[21] Moreover, the longer the government delays the availability of accelerated payment, and the issuance of final rules, the worse drawback claimants' predicament becomes. As the time deadlines for filing claims arrive, claimants will be forced to file claims in the atmosphere of uncertainty described above. As "accrual basis" taxpayers, claimants will need to recognize revenue for income tax purposes when they file their claims, and pay taxes, even though refunds may not be received until years later.

| | | | | | | |
|---|---|---|---|---|---|---|
| | Departing the United States | | | | | |
| 8 C.F.R. 217, 231, 251, 19 C.F.R. 4, 122, 178 | Electronic Transmission of Passenger and Crew Manifests for Vessels and Aircraft | 12/31/2001 | 71 FR 40035 | 12/24/2009 | 72 FR 48319 | 8Y |
| 19 C.F.R. 4, 103, 113, 122, 123, 178, 192 | Required Advance Electronic Presentation of Cargo Information | 7/23/2003 | 68 FR 43574 | 12/5/2003 | 68 FR 68139 | 5M |
| 19 C.F.R. 4, 10, 12, 18, 19, 113, 122, 123, 141–144, 146, 151, 181 | Changes to the In-Bond Process | 2/22/2012 | 77 FR 10622 | 9/28/2017 | 82 FR 45366 | 5Y 7M |
| 19 C.F.R. 111. | Modernization of the Customs Brokers Examination | 9/14/2016 | 81 FR 63149 | 6/30/2017 | 82 FR 29714 | 9M |
| 19 C.F.R. 101, 113, 133 | Customs and Border Protection's Bond Program | 1/5/2010 | 75 FR 266 | 11/13/2015 | 80 FR 70154 | 5Y 10M |
| 19 C.F.R. 7, 163, 178 | Documentation Related to Goods Imported From U.S. Insular Possessions | 1/14/2014 | 79 FR 2395 | 2/11/2015 | 80 FR 7537 | 1Y 1M |
| 19 C.F.R. 12, 163, 178 | Prohibitions and Conditions on the Importation and Exportation of Rough Diamonds | 4/15/2012 | 77 FR 48918 | 7/8/2013 | 78 FR 40627 | 1Y 3M |

| 19 C.F.R. 111, 163 | Customs Broker Recordkeeping Requirements Regarding Location and Method of Record Retention | 3/23/2010 | 75 FR 13699 | 6/8/2012 | 77 FR 33964 | 2Y 3M |
|---|---|---|---|---|---|---|
| 19 C.F.R. 4, 24 | Interest on Untimely Paid Vessel Repair Duties | 4/1/2011 | 76 FR 18132 | 3/26/2012 | 77 FR 17331 | 1Y |
| 19 C.F.R. 162, 163 | CBP Audit Procedures; Use of Sampling Methods and Offsetting of Overpayments and Over-Declarations | 10/29/2009 | 74 FR 53964 | 10/25/2011 | 76 FR 65953 | 2Y |
| 19 C.F.R. 102 | Rules of Origin for Imported Merchandise | 7/25/2008 | 73 FR 43385 | 9/2/2011 | 76 FR 54691 | 3Y 1M |
| 19 C.F.R. 123, 142 178 | Land Border Carrier Initiative Program | 12/17/2009 | 74 FR 66933 | 2/8/2011 | 76 FR 6688 | 1Y 2M |
| 19 C.F.R. 103, 178, 181 | NAFTA: Merchandise Processing Fee Exemption and Technical Corrections | 8/23/2006 | 71 FR 49391 | 9/17/2007 | 72 FR 52780 | 11M |

This history suggests that, at a minimum, the adoption of final regulations would take two years or longer.  By mid-late 2020, the economic harm to plaintiffs would be severe, if not fatal. And in its brief, the government cites with approval cases allowing delays of six years or longer

for the issuance of regulations.  Applying that timeline to this case could put the drawback program "on ice" until sometime in 2024.

### C.     Balance of Hardships Favors Plaintiffs and the Public Interest Favors Granting the Injunction

Other than claiming, without support, that that the lack of a final drawback calculation regulation makes it "impossible" for the Government to issue accelerated payments of drawback for TFTEA drawback claims, Defendants provide no reason why accelerated payment of estimated drawback refunds cannot be made to claimants holding accelerated payment rights under 19 C.F.R. § 191.92.

First, we note that, by their terms, accelerated payments are refunds of *estimated* drawbacks.  As noted in 19 C.F.R. § 191.92(a), "[a]ccelerated payment of drawback consists of the payment of *estimated* drawback before liquidation of the drawback entry" (emphasis added).  Thus, the only question is whether there is available to CBP a mechanism to "estimate" final TFTEA drawback amounts.  Clearly, the proposed calculation formula which Congress set out in 19 U.S.C. § 1313(*l*)(2), as added by Section 906(g) of TFTEA—which CBP has indicated it intends to adopt—provides such a basis.  Indeed, CBP requires this formula to be used in calculating the amount of drawback on the claims themselves.  Moreover, the formula is a conservative one, which uses two different parameters to limit the size of the claim: (1) the maximum claim is limited by the average unit value of the goods on the import entry line item (effectively requiring claimants to sacrifice refunds of duties paid on entered values exceeding such average); and (2) the claim is limited to the lesser of the duties payable on the average value, or the drawback payable on the exported good, had it been imported.  It seems unlikely that any final refund formula adopted by CBP will be more conservative.  The revenue is well protected.

Second, any risk to the revenue is already eliminated—as the agency itself has noted—by the fact that all accelerated drawback payments are secured, dollar-for-dollar, by bonds which drawback claimants provide to CBP in an amount sufficient for, and approved by, the agency. That risk to the revenue was eliminated by the bonds was recognized by CBP nearly half a century ago, when the forerunner of the current "accelerated payment" regulation was adopted.  *See Drawback Statements from Manufacturers or Producers*, 40 Fed. Reg. 14,749, 14,749 (U.S. Customs Serv. Apr. 2, 1975) ("In view of the bond guaranteeing the refund of any excess payments, any danger to the revenue would be ***eliminated***.").

Third, that TFTEA drawback claims must be "perfected" prior to liquidation is hardly a reason why CBP cannot make accelerated payments of drawback today. "Perfection" of claims is a current requirement of the drawback regulations, including those claims refunded to accelerated payment licensees, and claims must be perfected before they are finally liquidated.  Adjustment of accelerated payment amounts is directly bound up in the process of perfection and liquidation.  If it is determined that more accelerated drawback was paid than the liquidated drawback amount, the drawback claimant (or its surety) repays to CBP the excess amount of the accelerated payment. If the liquidated amount of drawback is greater than the accelerated payment, the excess is paid to the claimant when the drawback entry liquidates.  These mechanisms are all contained in the current drawback regulations.

Fourth, there is no merit to the Government's claim that, in the absence of the tardy calculation regulation, there is no way in which an applicant for accelerated payment of drawback can certify compliance with law.  To begin with, such a certification has already been made when the claimant receives its rights to accelerated payment under 19 C.F.R. § 191.92.  The regulation requires all claimant to certify compliance with all existing legal and regulatory requirements:

(3) Certification of compliance. In or with the application, the applicant must also submit a certification, signed by the applicant, that all applicable statutory and regulatory requirements for drawback will be met.

*Id.* §191.92(b)(3).  Thus, all of the claimant Plaintiffs have already certified compliance with statutory and regulatory requirements for drawback. On top of that, CBP's Guidance Document (Compl. Ex. A, at 10) specifically requires that, with each claim filed, the claimant submit an electronic Certification of Conformity.[22]

Thus, neither *perfection of claims*, *protection of the revenue*, or *certification of compliance* would appear to be a legitimate concern.

Fifth, the notion that the Government would somehow lose the ability to "verify" claims for accelerated payment of TFTEA drawback claims is without foundation.  *See* Whittenburg Dec., ECF No. 23-2, at ¶¶ 6, 22.  Yet claims appearing on page 7 of the Government's Brief as supported by the Declaration of Assistant Commissioner Cynthia Whittenburg, clearly shows that the Government is in exactly the same position with regard to TFTEA claims as it is with pre-TFTEA claims.  In paragraph 5 of her declaration, Ms. Whittenburg explains:

[P]rior to TFTEA, determining whether goods were of the same kind and quality, or were commercially interchangeable, to qualify for substitution was a commodity- specific question that imposed burdens on claimants (to prove that the merchandise met the applicable standard) and on CBP (to research and determine the eligibility of the goods).

As any given tariff classification (and entry line item) may be associated with many different imported products, only some of which might be of the "same kind and quality as" or "commercially interchangeable with" an export, calculation of a pre-TFTEA substitution

---

[22] One might question what the claimant is certifying compliance to, given that CBP's conforming regulations have not been proposed, much less finalized.  However, given the existence of the perfection and liquidation requirements, the certification requirement is best understood as the claimant agreeing to conform its claim to whatever regulatory requirements are finally adopted.

drawback claim must always occur at a part number, or SKU (*i.e.,* "stock keeping unit") level. This, in turn, requires detailed invoice information specifying the amounts paid for the qualifying part number, which level of detail is not available on a customs entry form.  Ms. **Whittenburg** acknowledges this in paragraph 6 of her statement:

> Under the pre-TFTEA framework, claimants typically calculated their drawback claims based on the invoice values of the imported merchandise, …. CBP then verified the total drawback amount for targeted entry summaries using the corresponding invoices.  Because invoices are not standardized and frequently not easily searchable using an automated program, the manual verification of invoice based refund calculations is labor-intensive and time consuming.

This language is repeated on pages 7 and 8 of the Defendants' Memorandum.  The Government uses these statements to argue that CBP is able to verify the accuracy of pre-TFTEA substitution drawback claims *before* making accelerated payment to a claimant.  Under longstanding practice, CBP has not in recent memory, and perhaps has never, validated substitution drawback claims at an invoice level *before* processing accelerated payment.  Indeed, under current procedures, it is wholly *impossible* for CBP to do this.  All drawback entries, both pre-TFTEA and post-TFTEA, are—since February 24, 2018—filed in ACE.  Invoice information for these transactions is not filed in ACE at the time of a customs entry, and does not accompany drawback entries.  Any payment of accelerated payment of a pre-TFTEA claim filed after February 24, 2018 would be made without CBP even having access to the invoices which Ms. **Whittenburg** states are used by the claimant to prepare drawback entries, and are needed by CBP to verify the amount  of the claim.  Consequently, at the time accelerated payment is requested, it is not possible for CBP to validate invoice detail—it does not have the invoices.  CBP remains protected by the drawback claimant's bond, and obligation to return any overpayments.  This is exactly the same situation that CBP would be in paying accelerated payment on TFTEA claims—it is not in a position to

completely verify the accuracy of the claim, but is always protected by the accelerated payment licensee's bond and its certification obligating the return of any overpayments.

Ms. Whittenburg also fails to note that CBP has an active program of conducting pre-and post-liquidation audits of drawback claimants, and that claimants who negligently filed false or fraudulent drawback claims would face not only the loss of their accelerated payment privileges under 19 C.F.R. § 191.92, but also potential civil penalties under 19 U.S.C. § 1593.

Finally, the wildest reason offered for not paying accelerated drawbacks is offered by the government on page 48 of its brief, where it argues that "overly litigious sureties could try to avoid paying a bond," arguing that because the claimants (to whom the sureties *issued a bond*) had no right to accelerated payment in the first place.  Not only is this rank speculation, but it presumes a situation which is untenable in the extreme.  A review of this Court's docket reveals no case where a surety is being sued for refusal to pay on a drawback bond, and a review of the Court's history shows no reported decision where this scenario arose.  Rather, a review of case law shows the opposite to be true, and that the surety's liability to pay duties in such a case is well-established. *See, e.g.*, *United States v. Blum*, 858 F.2d 1566 (Fed. Cir. 1988).

In addressing the question of the public interest, the Court should balance competing interests.  The government's entire appeal to the public interest lies in its claimed need to "protect the revenue," lest accelerated payments of drawback ultimately be found to have been excessive.  While this is a legitimate interest, it is not absolute.  The existence of bonds to secure overpayments to those who hold the accelerated privilege license, protects that interest fully—as Customs itself noted as far back as 1975.  Defendants have pointed to absolutely nothing which suggests that the bonding system no longer serves that function.

Other public interests are at play, too.  There is the longstanding public interest, in place since 1789, that drawbacks be paid to increase the nation's foreign commerce and aid American industry and labor.  *United States v. Nat'l Sugar Refining Co.*, 39 C.C.P.A. 96 (1951).  To this end, Congress did not command that a drawback refund should be promised, or suggested for the future, but that upon exportation, monies "*shall* be refunded as drawback."  19 U.S.C. §1313(a) (emphasis added).  Since, by Customs' own admission, the "revenue protection" issue is resolved by bonding, the question is whether it is reasonable to let the agency shut down the drawback program – possibly for several years – while conforming regulations are put in place.

The answer, plaintiffs submit, is for the Court to find a middle ground to allow the drawback program to operate uninterrupted while CBP finalizes its regulations. Restoration of the accelerated payment privilege to those plaintiffs have proven their competence and trustworthiness, certified their compliance with legal requirements and shown financial responsibility by the posting of bonds strikes the required balance.

In *Ohio Valley Environmental Coalition v. Army Corps of Engineers*, No. 08-979, 2008 U.S. Dist. LEXIS 88734 (S.D. Ohio Oct. 31, 2008), the court found a way to strike a balance between environmental concerns and economic ones. In that case, plaintiffs, concerned about environmental issues, sought relief which would shut down a mining company which held permits to conduct mining operations involving certain underground streams. Striking an order which allowed the mining firm to operate within the constraints of its permits, the Court noted that the mining company has "demonstrated that it takes its environmental responsibility seriously, and its track record shows that it will take steps to comply with permit conditions." Id. at *19.  The same is true here.  The claimant plaintiffs have demonstrated to CBP's satisfaction that they take their responsibilities under the drawback law seriously.  They have shown that they can file drawback

claims free from error, have earned licenses/permits for accelerated payment, and have taken affirmative steps, including the posting of bonds, to comply with the conditions of those permits. The requested injunction should be granted.

### III.   DEFENDANTS SHOULD BE ORDERED TO PRODUCE A COPY OF THE 450-PAGE DRAFT NPRM ON THE RECORD IN THIS ACTION.

Plaintiffs submit that the Court should require Defendants to produce the 450-page draft NPRM on the record in this action for the Court's consideration in ruling on the motion for a preliminary injunction.  The Complaint alleges that Defendants have unreasonably interpreted the TFTEA's rulemaking mandate, *see* TFTEA, § 906(g), as permitting (or perhaps requiring) a full revision of the drawback regulatory scheme.  The Government asserts that the 450-page NPRM sets forth "an entirely new part of the C.F.R. (new part 190) to address the scope of the changes to drawback *required by TFTEA*," Defs.' Mem. 41 (emphasis added), and submits that the delay is not unreasonable because "the outcome is extremely important" and affects the "entire trading community." *Id.* 41-42.  The Government claims that "significant progress has been made," noting that the "last step in the interagency consultation process"—OMB review—commenced in early April, 2018.

Such a rationale could be helpful to the Government's reasonableness claim if the TFTEA actually required an entire new regulatory scheme.  However, the only rulemaking "required by TFTEA" is found in § 906(g) of the TFTEA, which provides in pertinent part:

> (g) REGULATIONS.—Section 313(*l*) of the Tariff Act of 1930 (19 U.S.C. 1313(*l*)) is amended to read as follows:
>
> "(*l*) REGULATIONS.—
>
> "(1) IN GENERAL—Allowance of the privileges provided for in this section shall be subject to compliance with such rules and regulations as the Secretary of the Treasury shall prescribe.
>
> "(2) CALCULATION OF DRAWBACK—

> "(A) IN GENERAL—Not later than the date that is 2 years after the date of the enactment of the Trade Facilitation and Trade Enforcement Act of 2015, the Secretary shall prescribe regulations for determining the calculation of amounts refunded as drawback under this section.

*See* 19 U.S.C. § 1313(*l*)(1), (2).  And of course, Congress provided detailed guidance concerning methods for calculating drawback refund amounts that would meet Congressional approval.  *See e.g.,* 19 U.S.C. § 1313(*l*)(2)(B) (unused merchandise drawback); *id.* § 1313(*l*)(2)(C) (manufacturing drawback).

Defendants cannot cite any portion of the TFTEA as envisioning, let alone *requiring*, such a wholescale revision of the drawback regulations.  Calculation regulations are the only rulemaking required by the TFTEA.  In light of Congress' inclusion of a proposed calculation methodology and the two-year deadline for the agency to publish the necessary rules (*i.e.,* by February 24, 2018), the ongoing delay in rulemaking is incomprehensible.  However, the Government has craftily described the draft NPRM in its brief to suggest the delay is not unreasonable:

> The current draft of the NPRM is approximately *450 pages*. This document defines per unit averaging and explains its application with respect to different type of drawback claims. It clarifies the interplay between claims calculated based on per-unit averaging and those based on invoice values, including detailed proposals related to the first-filed and mixed claims rules. This document also explains the regulatory requirements for each type of drawback claim, including how it will be accepted and validated in ACE, both during the interim period and thereafter, and proposes several additional conforming amendments necessary to implement the full scope of TFTEA's amendments to the drawback law. The parameters set forth in TFTEA did not provide anywhere close to the guidance needed to implement the new framework required by the statute. In fact, *CBP is proposing an entirely new part of the C.F.R. (new part 190) to address the scope of the changes to drawback required by TFTEA*.

Defs.' Mem. 41 (emphasis added).  But of the 450 pages in the draft NPRM, how many pages are devoted to calculation methodology?  To be clear, the only portion of the draft NPRM relevant to the Court's review of unreasonable delay are those pages of the draft NPRM devoted to calculation

methodology.   This is because calculation regulations are the only regulations required by Congress in the TFTEA.  *See* 19 U.S.C. § 1313(*l*)(1), (2).

It logically follows that neither Plaintiffs, nor this Court, can intelligibly address Defendants' claims that the delayed rulemaking is not unreasonable without first being given an opportunity to review the draft NPRM.  The draft NPRM's 450-pages cannot possibly be devoted entirely to the TFTEA-required calculation methodology; and thus, Defendants should be compelled to produce a copy of the 450-page draft NPRM on the record in this action and explain (i) how those expansive portions of the draft NPRM not dealing with calculation methodology are relevant to the Court's immediate consideration of the reasonableness of the rulemaking delay; and (ii) how those portions of the draft NPRM dealing with calculation methodology could not be finalized within the two year deadline imposed by the TFTEA.

## CONCLUSION

Plaintiffs respectfully submit that the Court should deny the Defendants' Motion to Dismiss, and preliminarily enjoin Defendants by entering the Preliminary Injunction submitted herewith, and for such other and further relief as the Court may deem necessary and appropriate.

Respectfully submitted,

/s/ John M. Peterson
John M. Peterson
Richard F. O'Neill
Russell A. Semmel
NEVILLE PETERSON LLP
One Exchange Plaza
55 Broadway, Suite 2602
New York, NY 10006
(212) 635-2730
jpeterson@npwny.com

April 23, 2018

## UNITED STATES COURT OF INTERNATIONAL TRADE

```
-------------------------------------------------------------------- X
TABACOS DE WILSON, INC,                             :
TOBACCO RAG PROCESSORS, INC.,                       :
BROWN-USA, INC.,                                    :
NIPPON AMERICA GROUP/OKURA USA INC.,                :
SKATE ONE CORPORATION,                              :
ALLIANCE INTERNATIONAL, CHB, INC.,                  :
C.J. HOLT & COMPANY, INC.,                          :
CUSTOMS ADVISORY SERVICES, INC.                     :
                                                    :
          Plaintiffs,                               :
                                                    :          No. 18-cv-59 (JAR)
          v.                                        :
                                                    :
UNITED STATES OF AMERICA,                           :
U.S. CUSTOMS & BORDER PROTECTION,                   :
STEVEN T. MNUCHIN, in his official capacity as      :
   Secretary of the Treasury, and                   :
KEVIN K. McALEENAN, in his official capacity as     :
   Commissioner, U.S. Customs & Border Protection,  :
                                                    :
          Defendants.                               :
-------------------------------------------------------------------- X
```

## WORD COUNT CERTIFICATION

I, Richard F. O'Neill, Attorney at Neville Peterson LLP, who is responsible for the foregoing Memorandum in Support of Plaintiffs' Motion for Preliminary Injunction, relying upon the word count feature of the word processing system used to prepare the brief, hereby certify that this Memorandum contains **13,742 words** and therefore complies with the word count limitation under the Court's Chambers Procedures.

/s/ Richard F. O'Neill